IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LORRIE WATERS and DERREL          )
KEITH WATERS,                     )
                                  )
      Plaintiffs,                 )
                                  )
v.                                )          CASE NO.: 2:17-cv-133-RAH
                                  )                  (WO)
AIG CLAIMS, INC. and NATIONAL     )
UNION FIRE INSURANCE COMPANY      )
OF PITTSBURGH, PA,                )
                                  )
      Defendants.                 )

## MEMORANDUM OPINION AND ORDER

This ERISA action was brought by Plaintiffs Lorrie and Keith Waters after they were denied benefits under an employer-provided life insurance policy that insured the life of their son, Cody Waters, who died in a single vehicle motor vehicle accident in Louisiana on August 15, 2015. Pertinent to the instant case is the insurance policy's coverage exclusion for intoxication-related deaths.

Pending before the Court is a raft of motions, including competing dispositive motions (Docs. 171, 172), competing motions to exclude the opinions of the other party's respective toxicologist experts (Docs. 169, 170, 174), and a spoliation motion (Doc. 163) filed by the Waterses following the Defendants' alleged destruction of a fluid sample collected during Cody's autopsy.

## I.   LEGAL STANDARD

The Waterses have filed a Motion for Summary Judgment, and Defendants AIG Claims, Inc. and National Union Fire Insurance Company of Pittsburg, PA (collectively,

AIG) have filed a Motion for Judgment as a Matter of Law.  Based on the parties' stipulation to the Court's resolution of this case "on the papers," the Court will make a final ruling on the briefs and evidentiary submissions with findings of fact and conclusions of law. This practice has been found to be the preferable one in ERISA cases by other district courts and has been approved by the Eleventh Circuit. *See Faison v. Donalsonville Hosp., Inc.*, 534 F. App'x 924, 925 (11th Cir. 2013) (affirming a district court's conclusions from an ERISA "trial on the papers").

In an ERISA benefits denial case, "the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Curran v. Kemper Nat'l Servs., Inc*., No. 04-14097, 2005 WL 894840, at * 7 (11th Cir. Mar. 16, 2005) (per curiam) (quotation marks and citation omitted). The summary judgment standard in ERISA cases is therefore different from the ordinary summary judgment standard that applies in other cases. *See Ruple v. Hartford Life & Accident Ins. Co.,* 340 F. App'x 604, 610 (11th Cir. 2009) (per curiam). "[T]he usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Jones v. Fed. Express Corp*., 984 F.Supp.2d 1271, 1275 (M.D. Fla. 2013) (alteration added) (quotation marks and citation omitted). "Thus, there may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would." *Miller v. PNC Fin. Servs. Grp., Inc*., 278 F. Supp. 3d 1333, 1341 (S.D. Fla. 2017) (quotation marks and citation omitted).

2

The ERISA statute provides no standard for courts reviewing the benefits decision of claims administrators. *Blankenship v. Metro. Life Ins. Co*., 644 F.3d 1350, 1354 (11th Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)). However, the Supreme Court in *Firestone* established three distinct standards for reviewing an ERISA plan administrator's decision: (1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion, and the administrator has a conflict of interest. *See Buckley v. Metropolitan Life,* 115 F.3d 936, 939 (11th Cir. 1997). The Eleventh Circuit, applying Supreme Court precedent, expanded the *Firestone* test into a six-step analysis "for use in judicially reviewing virtually all ERISA-plan benefit denials."   *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004). The framework is as follows:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision;

(2) If the administrator's decision is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end the judicial inquiry and reverse the decision;

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard);

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest;

(5) If there is no conflict, then end the inquiry and affirm the decision;

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355.

Applying the *de novo* standard, "[t]he Court must consider, based on the record before the administrator at the time its decision was made, whether the court would reach the same decision as the administrator." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008). In making this determination, the court does not give any deference to the administrator's decision; rather, the court "stand[s] in the shoes of the administrator and start[s] from scratch, examining all the evidence before the administrator as if the issue had not been decided previously." *Bates v. Metro. Life Ins. Co.*, No. 5:08-cv-22 (CAR), 2009 WL 2355834, at *10 (M.D. Ga. July 27, 2009) (internal quotations and citation omitted). The claimants bear the burden of proving they are entitled to ERISA benefits. *See Glazer*, 524 F.3d at 1247.

## II.   FACTS AND PROCEDURAL HISTORY

### A. Accident, Autopsy and Police Department Causation Opinion

Cody Waters died in a single vehicle, roll-over crash around 11:00 p.m. on August 15, 2015, in Shreveport, Louisiana. (Doc. 170-8; Doc. 173-2 at 101-104; Doc. 173-4 at 7–10.)  There was one eyewitness to the accident, who saw Cody's vehicle veer to the right, then to the left, then to the right again, and then flip over and roll into the grass. (Doc. 170-8 at 2; Doc. 173-2 at 92.) Cody was ejected from the vehicle and emergency responders declared him dead at the scene. (Doc. 173-2 at 92.)

Cody's body was transported to the LSU Health Sciences Center Department of Pathology in Shreveport for an autopsy. (Doc. 173-2 at 101–04; Doc. 173-4 at 9.)

Dr. Long Jin of Louisiana State University performed the autopsy around 10:30 a.m. on August 16, 2015—less than twelve hours after the accident. (Doc. 173-3 at 29–33.) Dr. Jin drew samples of cardiac blood, vitreous fluid, and urine, but he only sent the cardiac blood and urine off for analysis by a third-party vendor, NMS Labs. (Doc. 173-3 at 29, 33.) Cody's cardiac blood ultimately tested positive for ethanol, showing a blood alcohol concentration (BAC) of 0.113%, an amount in excess of Louisiana's 0.08% legal limit to operate a motor vehicle. (Doc. 173-3 at 34.) The urine sample was negative for drugs. (Doc. 173-3 at 33–35.)

Dr. Jin included these toxicology results in his final autopsy report, and also noted in the report the massive internal and external damage to Cody's chest cavity. (Doc. 173-3 at 29–33.) With the autopsy report in hand, the Shreveport Police Department Traffic Crash Reconstructionist/Crash Investigator closed the case, concluding that Cody's death was "accidental" with the "causal factor of the crash determined to be careless operation of the motor vehicle due to ethanol intoxication (alcohol impairment)." (Doc. 173-4 at 10.)

The State of Louisiana Certification of Death contained a similar conclusion. (Doc. 173-2 at 88.) It identified the cause of death as "crush injuries to the head" and "multiple blunt force injuries," with "ethanol use" being an "other significant condition[] contributing to death but not resulting in the underlying cause given." (*Id.*)

**B.  The Policy, Claim, Investigation and Claim Denial**

Through his employment with ExpressJet Airlines, Inc. and participation in the ExpressJet Airlines, Inc. Consolidated Welfare Benefit Plan, Cody had elected accidental death and dismemberment (AD&D) protection of $500,000, and named his parents, the Waterses, as beneficiaries. (Doc. 173-2 at 29–77, 87.)  The policy was issued to ExpressJet Airlines and underwritten by Defendant National Union Fire Insurance Company to insure the accidental death and dismemberment component of the ExpressJet ERISA plan. (*Id.* at 29–77.) Claims under the policy were administered by AIG.

Under the policy, 100% of the principal sum would be paid if an injury caused by an accident resulted in death within 365 days of the date of the accident that caused the injury. (*Id.* at 47.)  However, pertinent to the dispute here, the policy contained an exclusion for death "caused in whole or in part by, or resulting in whole or in part from, . . . the Insured Person being under the influence of drugs or intoxicants, unless taken under the advice of a Physician." (*Id.* at 49.) The "under the influence" language of the exclusion did not require any particular threshold, such as a state legal limit, for intoxication.

Following Cody's accident, the Waterses made a claim for the life insurance benefits under the policy. (*Id.* at 15, 23, 125–26.) AIG began a review of the claim. (*Id.* at 15.)

After receiving the death certificate, police report, and autopsy report, AIG's assigned claims examiner requested a forensic toxicology peer review from Dr. Gary Lage, a toxicologist, for purposes of "determining the level of impairment due to being under the influence of intoxicants." (*Id.* at 13.)  At the outset, Dr. Lage noted the reliability issues

associated with the use of cardiac blood, rather than vitreous fluid, as the basis for determining Cody's blood alcohol content at the time of the accident. (*Id.* at 183.) As Dr. Lage noted, it is widely recognized in forensic toxicology that the ideal source of postmortem fluid for blood alcohol level analysis is from a peripheral source, such as vitreous fluid. (*Id.*) "Cardiac blood is not ideal, due to the fact that it is possible that if there is still a large amount of alcohol in the stomach at the time of death that can diffuse from the stomach to the heart, resulting in a false elevation of blood alcohol level." (*Id.*) That cardiac blood was used here raised a question as to the accuracy of Cody's BAC of 0.113% at the time of accident. (*Id.*)

Nevertheless, with what he had available to him, Dr. Lage concluded that the cardiac blood test was good enough to show a BAC of .08% or more. (*Id.*) As he stated, "it is unlikely that his level would have been significantly lower than the 0.113 % reported, and in my opinion that any contribution from postmortem diffusion, if it existed, would not have reduced his blood alcohol level below 0.08%." (*Id.*)

Dr. Lage also concluded that Cody would have been intoxicated at the time of the crash, causing delayed reaction times and impaired vision, which in turn would have impacted Cody's ability to react normally to prevent an accident. (Doc. 173-2 at 183.) More specifically, Dr. Lage concluded that, at the time of the accident, Cody "was intoxicated with Ethanol and incapable of safely operating a motor vehicle" and that Cody's "intoxication and impairment are responsible for the accident and his death." (*Id.*)

During its claim investigation, AIG received correspondence from an attorney for the Waterses who raised concerns about using cardiac blood for the BAC determination

and also claiming that AIG's investigation was incomplete. (Doc. 173-6 at 61–62.) AIG discussed these concerns with Dr. Lage, who responded that, as discussed in his report, the cardiac blood and the lack of vitreous analysis were "the bigger issues" but that, considering the circumstances at the scene and the quick time between death and the autopsy, "[p]ostmortem formation would not be expected to be an issue" because it occurs "when the body is not preserved for a period of time."  (Doc. 173-6 at 71.)

Ultimately, by letter dated April 1, 2016, AIG denied the Waterses' life insurance claim based on the insurance policy's intoxication exclusion, citing the eyewitness report about the accident, the Shreveport Police Department crash report, the autopsy and toxicology testing, the death certificate, and Dr. Lage's review. (Doc. 173-6 at 87–90.)

**C.  Appeal and Louisiana Litigation**

The Waterses appealed AIG's claim decision on October 26, 2016. (Doc. 173-13 at 349–54.)   With their appeal, the Waterses submitted a report from Dr. Jimmie Valentine, a toxicologist, who opined that Cody's cardiac blood sample could not reasonably be used to conclude that Cody was intoxicated at the time of the accident because of the possibility of postmortem fermentation and redistribution/diffusion. (Doc. 173-14 at 426–45; Doc. 173-15 at 1–47; Doc. 173-16 at 2–48.)

AIG then hired Janci Lindsay, also a toxicologist, to perform a toxicology evaluation and investigate the issues raised by Dr. Valentine. As part of her work, Dr. Lindsay discovered that LSU still possessed vials of Cody's vitreous fluid which could be obtained through the issuance of a subpoena. (Doc. 173-2 at 5; Doc. 173-17 at 166, 207.)

AIG retained Louisiana legal counsel and filed a legal action in Louisiana state court on January 10, 2017 to obtain the vitreous fluid for purposes of testing. (Doc. 173-19 at 9–15.) While it is undisputed that AIG made no efforts before the lawsuit filing to notify the Waterses or their counsel of the existence of the vitreous fluid, or that it intended to file a legal action to obtain and test the samples, it is disputed as to *when* the Waterses and their legal counsel became aware of the Louisiana lawsuit once it was filed. Because the Waterses did not enter an appearance in the Louisiana matter, the Louisiana court ultimately appointed an attorney to represent their interests. (Doc. 173-19 at 109.) Efforts to serve the Waterses with notice of the action proved difficult as both the Waterses and their legal counsel refused to sign for or accept the certified mail issued in response to the filing.

The Waterses filed this ERISA suit in Alabama on March 6, 2017. (Doc. 1.) AIG was served in this action on March 13, 2017. (Doc. 5.)

On May 1, 2017, the Louisiana state court entered an order allowing AIG to conduct pre-litigation discovery. AIG then issued two subpoenas: one for records from the Louisiana coroner and one directing LSU to send Cody's vitreous samples and documents concerning the samples' chain of custody to NMS Labs, the same vendor that had previously tested Cody's cardiac blood samples. (Doc. 185-1 at 10–16.)

On May 2, 2017, in an effort to expedite its efforts, AIG sent "courtesy" copies of the subpoenas to the coroner and LSU.  AIG, through its Louisiana counsel, also provided LSU with paperwork that included a pre-filled instruction form with chain of custody information and directions for LSU to include it with the vitreous samples sent to NMS

Labs. (Doc. 164-14 at 2; Doc. 185-1 at 23.) The paperwork contained no shipping instructions, such as cold storage, nor did it instruct NMS Labs to store the samples or return the samples to AIG, LSU, or the Waterses. Instead, by failing to direct the lab otherwise, the paperwork authorized NMS Labs to destroy the samples. (*Id.* at 6 ("Failure to notify NMS Labs in writing of a request for storage beyond the routine period(s) will be considered authorization to discard or destroy the specimen(s)").) The subpoena and attached forms were formally served on May 7, 2017, and the samples were shipped to NMS Labs the following day on May 8, 2017.

AIG, however, cancelled the test on May 9, 2017, after allegedly concluding that the samples had not been properly stored at LSU. (Doc. 164-15; Doc. 164-23 at 2.) The following day, AIG filed a motion to dismiss the ERISA case in Alabama, arguing the Waterses had failed to exhaust their administrative remedies. (Doc. 36.) The Waterses claim that this motion was the first occasion in which AIG notified them that Cody's vitreous fluid samples still existed. (Doc. 36 at 3–4; Doc. 164-18 at 3.) Based on AIG's representations, this Court stayed the case, pending the conclusion of AIG's review of the appeal. (Doc. 47.)

On May 16, 2017, NMS Labs notified AIG's Louisiana counsel by mail that the vitreous samples would be destroyed in six weeks absent instructions otherwise. (Doc. 164-19 at 2.) The record does not show that AIG or its attorneys responded to this letter or made any effort to prevent the samples from being destroyed. (Doc. 164-23 at 2.)

That same day, the Waterses retained Louisiana counsel and simultaneously filed a Notice of Removal and a Motion to Transfer to Alabama. As a result of communications

between counsel, an agreement was reached on May 26, 2017 to dismiss the Louisiana action subject to AIG's provision of records from the subpoenas to the Waterses. (Doc. 164-43 at 2.)

On July 3, 2017, NMS Labs sent another letter via e-mail to remind AIG that the vitreous samples would be destroyed imminently. (Doc. 164-23 at 2.) After AIG again failed to respond, NMS Labs destroyed Cody's only remaining vitreous fluid samples five days later on July 8, 2017. (Doc. 164-15 at 2.)

Nearly two months later, on August 31, 2017, Dr. Lindsay finished her report. (Doc. 173-19 at 230–245.)  In her report, Dr. Lindsay addressed Dr. Valentine's concern that, because of the refrigerated conditions under which the body was stored at the Louisiana medical examiner's office before the autopsy, "no significant post-mortem synthesis of alcohol should occur." (*Id.* at 232–33.) She also noted that the cardiac blood revealed a BAC of 0.113, that this test result was accepted in the autopsy report, that 0.113 BAC would have caused significant impairment to coordination, perception, and reaction times and that, even at a lower BAC, visual tracking, peripheral vision, and glare recovery would be impaired. (*Id.* at 233.) Ultimately, she concluded that based on the evidence, including Cody's "erratic driving late in the evening on a Saturday night and subsequent loss of control of his vehicle prior to the accident," that "it is more likely than not that [Decedent] was intoxicated with significant amounts of alcohol at the time of the accident that led to his death and that the alcohol results in his cardiac blood were correct and that this alcohol in his system contributed to his accident and his fatality." (*Id.* at 237.) In providing these

11

opinions, Dr. Lindsay also acknowledged that testing of BAC from a vitreous fluid sample is a more accurate test of BAC than from cardiac blood. (Doc. 173-2 at 5.)

With this final report in hand, the AIG appeal examiner sent the claim to AIG's ERISA Appeals Committee, which upheld the claim denial. (Doc. 173-2 at 2; Doc. 173-20 at 13–17.) The Waterses were notified of the decision by a letter dated October 17, 2017. (Doc. 173-20 at 13–17.)

On October 27, 2017, the Waterses filed a motion to lift the stay and to permit discovery, as well as a motion requesting spoliation sanctions concerning the alleged concealment and destruction of evidence; that is, Cody's vitreous fluid samples. (Doc. 59; Doc. 60.) The Waterses' motion also sought to prevent spoliation of the samples. Two weeks later, on November 13, 2017, AIG informed the Court and the Waterses that the samples had already been destroyed. (Doc. 62 at 5.)  The Waterses then withdrew their motion to stay because the need to preserve the samples was now moot.

Following discovery, both parties filed the motions that are pending before the Court, including competing dispositive motions, motions to exclude expert opinions, and a motion for sanctions following the destruction of Cody's vitreous fluid samples. The Court now turns to these motions.

### III.    DISCUSSION

#### A. The Parties' Experts

##### 1.  Consideration of the Experts

While this is an ERISA case that turns largely upon this Court's review of the administrative record, both parties have filed motions to strike or limit the other party's

expert witnesses, all of whom provide opinions concerning Cody's BAC at the time of the accident and the reliability of a BAC determination from cardiac blood.  None of these so-called *Daubert* issues were presented to the AIG claims examiner (at least in a motion format typical of that presented here).  Instead, these issues are now being presented to this Court after-the-fact as part of the Court's *de novo* review. And from the Waterses' perspective, apparently it is with the hope of having this Court undertake *de novo* review in the absence of opinions from AIG's toxicologist professionals that attribute alcohol as a contributing factor to Cody's motor vehicle accident and resulting death.  The Court finds fault with the Waterses' argument.

As this Court must conduct a *de novo* review of the administrative record, strict adherence to *Daubert* or the Federal Rules of Evidence is neither appropriate nor warranted.  Indeed, courts that have considered this issue have held that *Daubert* standards are inapplicable to a court's review of the administrative record in an ERISA case. *See, e.g., Wyatt v. AMEC Choices Benefits Program Long Term Disability Ins. Plan,* 2005 WL 1186114, at *5 (S.D. Tex. May 19, 2005);  *Hufford v. Harris Corp.,* 322 F. Supp. 2d 1345, 1358 (M.D. Fla. 2004); *VanWright v. First Unum Life Ins. Co.,* 740 F. Supp. 2d 397, 404 (S.D.N.Y. 2010) ("Rule 702 and Daubert do not apply in ERISA actions."); *accord Dowdy v. Hartford Life & Acc. Ins. Co.,* 458 F. Supp. 2d 289, 302 n. 13 (S.D. Miss. 2006) (citing cases);  *Herman v. Hartford Life & Acc. Ins. Co.,* 508 F. App'x 923, 928 (11th Cir. 2013); *Frame v. Hartford Life & Accident Ins. Co.,* 257 F. Supp. 3d 1268, 1276 (M.D. Fla. 2017).

Here, the reports from the toxicologist experts in this case largely were made a part of the administrative record and the primary question for this Court is whether AIG's claim

decision was wrong, not whether the experts were qualified under *Daubert* or the Federal Rules of Evidence.  *See Wyatt,* 2005 WL 1186114, at *5. Accordingly, the Court concludes that the Waterses' motion to strike the reports of Dr. Lage, Dr. Lindsay, and Dr. Johnson are due to be denied to the extent the Waterses base their challenges under *Daubert* and the Federal Rule of Evidence.  That also holds true of AIG's motion to strike Dr. Valentine to the extent AIG raises a similar challenge.

### 2.  The Experts' Qualifications

Still, although AIG was not required to conduct a stringent *Daubert*/702 analysis, the toxicologist experts—Dr. Jimmy L. Valentine, Dr. Gary L. Lage, Dr. Janci C. Lindsay, and Dr. Robert Johnson—must be competent to address issues regarding blood alcohol testing and analysis of the resulting data; that is, they must have knowledge, skill, experience, training or education in this field. Fed. R. Evid. 702; Fed. R. Evid. 104(a); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993); *Helms v. Gen. Dynamics Corp*., 222 F. App'x 821, 828 (11th Cir. 2007) ("We have been critical of a nurse's review when a meaningful review dictated assessment of specialized tests beyond a nurse's training.").

Given that all of the experts have extensive education, training, and knowledge in toxicology, have worked as toxicologists, and have taught courses in toxicology, the Court finds no reason why any of these individuals would not be qualified to review a BAC test result, opine on the strengths and weaknesses of certain tests, and respond to the positions

and testimony of the others.[1] *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 582 (8th Cir. 2008) ("Wakkinen points to no evidence that calls into question the expertise of Dr. Jacobson personally or of a doctor who specializes in occupational medicine to offer an opinion on the condition of fibromyalgia"). The Court concludes these experts are, and were, sufficiently qualified to give the challenged opinions.

### 3. Admissibility of the Experts' Opinions

The next consideration is the admissibility of the experts' opinions. Admissibility seems to be the primary bone of contention between the parties who focus their attention on peer reviewed articles and the facts surrounding the accident, resulting death, storage of the body, and the fluid samples.

Courts require an expert's testimony to be both reliable and relevant. *Umana-Fowler v. NCL (Bah.) Ltd.*, 49 F. Supp. 3d 1120, 1121 (S.D. Fla. 2014) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)). Expert testimony must also assist the trier of fact in understanding evidence or determining a fact at issue; be based on sufficient facts or data; be the product of reliable principles and methods; and be reasonably applied to the facts of the case. Fed. R. Evid. 702; Fed. R. Evid. 104(a); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993).

But again, this matter is before the Court largely on an administrative record review, and the majority of the parties' criticisms and challenges about the other's experts "are more appropriately considered an objection going to the weight of the evidence rather than

---

[1] AIG did not raise a challenge to Dr. Valentine's qualifications. Accordingly, the Court engages in no such analysis as it concerns Dr. Valentine.

its admissibility." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011); *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013). This is particularly so in a non-jury context. *Found. Resol. Corp. v. Aon Hewitt Inv. Consulting, Inc.*, No. 5:18-CV-458-OC-30PRL, 2021 WL 1342451, at *5 (M.D. Fla. Mar. 10, 2021) (citing *U.S. v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005)). For that reason alone, all of the parties' objections are due to be denied. Nevertheless, the Court will engage in a review of what it believes to be the parties' primary criticisms of the other party's experts.

### i)    Dr. Janci Lindsay

The Waterses raise a series of issues concerning the reliability of Dr. Lindsay's report and her accompanying opinions regarding Cody's BAC at the time of the accident. All of these concerns focus on the central theme that, according to the Waterses, the BAC level reflected in Cody's cardiac blood was unreliable and too high due to postmortem issues such as fermentation (i.e., postmortem synthesis of alcohol) and redistribution/diffusion. The Waterses argue that Dr. Lindsay's opinions contradict certain peer reviewed papers, including those authored by Carol O'Neal (*see* Doc. 170 at 5-6; Doc. 170-3) and Dr. Valentine (*see* Doc. 170-5). AIG counters that Dr. Lindsay's opinions on the matter are supported by peer reviewed papers and statistics. (*See, e.g.,* Doc. 178-2 at 6–7, "In a study of 100 cases, heart blood was observed to be a reliable specimen for postmortem alcohol determinations and interpretations.")

The Court has read Dr. Lindsay's report and the referenced papers, as well as the other papers submitted by the parties. The Court disagrees with the Waterses' broad

assertions of clear contradictions. Dr. Lindsay's opinions generally are supported by peer reviewed papers and statistics.[2] Indeed, these papers are based on case studies, and they generally recognize that postmortem fermentation and redistribution/diffusion can happen and can account for some observed ethanol concentration *depending on the facts*. The Court will not strike Dr. Lindsay's opinions, or ignore them, based on the assertion that her opinions conflict with certain peer reviewed articles.

The Waterses also assert that it was inappropriate for Dr. Lindsay to rely on the circumstances of the accident as evidence of Cody's intoxication because Dr. Lindsay is not qualified on this point, her analysis is based on inaccurate facts, and her analysis "attempts to make a dispositive finding of fact." (Doc. 170 at 13–14.) In other words, the Waterses characterize this aspect of Dr. Lindsay's opinions as an attempt to give opinions as a driving or accident reconstruction expert, an area of expertise outside of her qualifications as a toxicologist. The Court agrees to a limited point and considers Dr. Lindsay's opinions accordingly. As a toxicologist, Dr. Lindsay is qualified to opine generally on the effects of alcohol on a person. And while she certainly can testify to the effects of alcohol on certain aspects of driving, such as reaction time, the Court agrees that any opinion specifically directed to the cause of Cody's accident has little overall evidentiary value from the Court's viewpoint. Accident reconstruction opinions clearly were appropriate for the Shreveport Police Department accident investigator who actually

---

[2] Even if her opinions were contradicted, this does not render them inadmissible per se. Such issues go to the weight to give her opinions, an issue especially appropriate given this Court's role.

investigated the accident, conducted witness interviews, inspected the scene and vehicles, and reviewed the medical examiner's file.

To the extent the Waterses claim that Dr. Lindsay's opinions are grossly prejudicial under Rule 403 because she relies upon hearsay, such assertion is without import given this Court's role. As part of the administrative appeal review, the rules of evidence, including hearsay, do not apply to the claims administrator's review. *See Blair v. Metro. Life Ins. Co.*, 955 F. Supp. 2d 1229, 1249 n.13 (N.D. Ala. 2013) (citing *Herman*, 508 F. App'x at 927–29). And further, experts can rely upon hearsay. *See, e.g., Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 809 (11th Cir. 2017).

As it concerns testing of the vitreous fluid samples, that the samples were destroyed and not tested does not render Dr. Lindsay's opinions so unreliable or faulty that they should altogether be excluded from consideration. Instead, the destruction of the vitreous samples becomes important in how this Court deals with the spoliation issue and what those test results may have revealed.

In short, the Waterses' criticisms of Dr. Lindsay all go to the weight and credibility of her opinions, which would be ripe for cross-examination in an adversarial proceeding. But these criticisms are not sufficient to exclude Dr. Lindsay's opinions on an ERISA record review. *Pledger v. Reliance Tr. Co.*, No. 1:15-CV-4444-MHC, 2020 WL 6101409, at *11 (N.D. Ga. Jan. 24, 2020) (explaining that "the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."). Further, it is not within the Court's purview to nit-pick an expert's opinions in such a manner as the Waterses ask in this case. The Court finds Dr. Lindsay's opinions sufficiently

reliable and reasonable to be considered, except to the extent her opinions impede into the area of accident reconstruction.

### ii)      Matthew McMullin

The Waterses seek to exclude the opinion of Matthew McMullin, a forensic toxicologist at NMS Labs. McMullin's opinion was included in Dr. Lindsay's report and in a November 2017 letter that McMullin authored. (*See* Doc. 170 at 17–22.) McMullin opines that the ethanol concentration in Cody's vitreous fluid in 2017 would not be a reliable indicator of the concentration as it existed in 2015. The Waterses challenge McMullin's opinion on the grounds of hearsay, *Daubert,* and reliability.

But again, hearsay does not apply to materials obtained by the claims administrator during an ERISA review. As to the Waterses' Rule 702 and *Daubert* challenges, the record, including McMullin's November 2017 letter and his responses to the Waterses' discovery requests, sufficiently establishes the grounds for his conclusion about the relationship between ethanol in the vitreous fluid sample at the time of collection in 2015 and the time it was sent to NMS Labs in 2017.

The Waterses' Rule 703 objection is equally flawed because Rule 703 expressly states that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of . . . ." Fed. R. Evid. 703. There is nothing in Rules 702 or 703 that prevents an expert from relying on facts and data provided by strangers or third parties.

And the Waterses' other challenges, such as the lack of an expert report, McMullin's testimony that he was not a retained expert, his testimony that purportedly contradicts Dr. Lindsay's opinions about the accident, his testimony about evaporation, his receipt of

payments from AIG for his work, and his failure to produce communications, largely are quibbles with issues either not germane to this Court's role or that instead go to the weight and credibility of McMullin's opinions. The Waterses' challenge to McMullin's opinion does not constitute grounds for exclusion. Accordingly, the Court will consider McMullin's opinion.

### iii) Robert D. Johnson

The Waterses also challenge the opinions of Dr. Robert D. Johnson, a toxicologist retained by AIG's counsel during this litigation to interpret Cody's forensic toxicology results. In his report dated February 26, 2021, Dr. Johnson concluded that Cody's driving behavior was consistent with someone driving under the influence of alcohol, that there should be no concerns about the postmortem formation of ethanol under the facts of this case, and that it is a certainty that Cody consumed alcohol before the accident and was under the influence of alcohol at the time of the accident.   The Waterses challenge Dr. Johnson's opinions and his report, raising a host of issues including insufficient evidence of Dr. Johnson's qualifications; that his conclusions are merely his own *ipse dixit*; that his opinions are contradicted by the record and various internet sources; and that his opinions are unfairly prejudicial under Rule 403.  The primary disputed opinion is Dr. Johnson's assertion that the vitreous fluid would have been impossible to interpret at the time of its destruction in 2017 due to oxidation within the samples, which the Waterses challenge as unsupported by any accepted sources.

The Court will not dwell on all of the reasons why the Waterses' motion is due to be denied, but it will touch on a few of them. First and foremost, Dr. Johnson is clearly

qualified to opine on alcohol intoxication and its effect on driving performance. Dr. Johnson is Chair of the National Safety Council's Alcohol, Drugs, and Impairment Division. He is also the chief toxicologist in one of the largest counties in the country, and his job for the past decade has been to assist in the determination of the cause and manner of death in cases involving drugs and alcohol. He also assists both law enforcement agencies and pathologists in determining the cause and manner of death in cases involving drugs or alcohol.

As it concerns the Waterses' claim that Dr. Johnson's opinions are speculative and unreliable, these concerns, again, go to the weight and credibility of Dr. Johnson's opinions rather than to their exclusion. For example, Dr. Johnson's opinion about the interpretability of a test of the vitreous fluid or lack of contamination of cardiac blood are sufficiently supported by peer reviewed articles and publications, his own experience, and the facts in this case.   Similarly, the Waterses' concerns about other issues, such as those concerning sodium fluoride, are generally not supported by the record and do not constitute grounds for exclusion.

The Waterses also argue that Dr. Johnson's opinions are not reliable because they do not address the theory of redistribution/diffusion of ethanol in Cody's body.   But an expert is not required to address all alternative theories, nor would an expert's failure to do so be a sufficient basis for exclusion where the court is the factfinder. *See Fuller*, No. 1:11-CV-784-ODE, 2019 WL 5448206, at *20. And regardless, Dr. Johnson's report did acknowledge, although not in depth, that postmortem redistribution was a possibility.  The

fact that Dr. Johnson did not do a deep dive into this issue affects the weight of the evidence. It is not a basis for exclusion.

The Court does note, as it concerns Dr. Johnson, that he was retained by AIG after the final claim decision was made, and therefore his opinions were not part of the administrative record and are largely duplicative of the opinions given by the toxicologists involved in the claim decision.   Regardless, the Court concludes that Dr. Johnson's opinions are not due to be stricken or limited. The Court will take these opinions into consideration, giving them the weight and credibility that they are due.

### iv)   Dr. Jimmie Valentine

That brings the Court to the opinions of Dr. Valentine, the Waterses' own toxicology expert. Dr. Valentine has given a multitude of opinions, but primarily opines that cardiac blood cannot be scientifically justified for determining postmortem BAC, that postmortem fermentation and redistribution/diffusion account for an undetermined amount of ethanol in the cardiac blood, and that Cody's vitreous fluid specimen would have permitted a more valid scientific interpretation of his postmortem BAC. Not to be outdone by the Waterses' efforts to strike or limit experts, AIG has filed a motion of its own, targeting Dr. Valentine. AIG argues that Dr. Valentine's opinions concerning the effect of postmortem formation and redistribution of alcohol on BAC are effectively conclusory and not supported by the scientific literature he cites. AIG further argues that Dr. Valentine's proposed ability to accurately calculate BAC from eighteen-month-old vitreous fluid is contradicted by scientific consensus and his own prior opinions.

Dr. Valentine is appropriately qualified, has explained the basis for his opinions and has cited numerous peer reviewed articles and studies in support of his opinions. AIG's issues with his opinions go to their weight and credibility. These are not grounds for exclusion, especially given this Court's role in determining whether AIG's claims decision was wrong.  Therefore, AIG's motion to strike Dr. Valentine's opinions is due to be denied and his opinions will be considered.

**B. Spoliation**

The Waterses bring a spoliation allegation arising out of the destruction of Cody's vitreous fluid samples and associated paperwork. The Waterses place primary emphasis on the vitreous samples because those samples were the only remaining objective evidence with which the Waterses could have challenged the cardiac blood results.  According to the Waterses, AIG surreptitiously obtained a court order to obtain the samples from a Louisiana state court under false pretenses, stalled the ERISA case before this Court, obtained the vitreous samples from LSU, directed the transfer of the samples to a self-selected vendor, canceled the testing, and then authorized and allowed the samples to be destroyed, all without the knowledge or permission of the Waterses. Because of this, the Waterses argue, the Court should sanction AIG by entering a default judgment, striking experts, or making inferences against AIG.

AIG responds that the vitreous fluid samples were compromised due to their age and means of storage, thereby rendering any test results unreliable and irrelevant. It further argues that the destruction of the samples should be without consequence because the samples were destroyed in error and not due to any malice or malintent on AIG's part.

The Court has concerns with AIG's stated position especially because it displays a reckless viewpoint toward an event that AIG should not have allowed to happen. This is especially true considering that AIG is a sophisticated party, was represented by counsel, and was thoroughly familiar with litigation and the need to preserve evidence. Despite AIG's contentions, this spoliation issue is not without consequence and warrants a deeper discussion.

To begin, spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)).

Spoliation relief is determined by weighing culpability and prejudice. *E.g., Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 946 (11th Cir. 2005) ("The court should weigh the degree of the spoliator's culpability against the prejudice to the opposing party."). The Eleventh Circuit has set out certain factors for district courts to consider when deciding whether to impose a spoliation sanction: "(1) whether the party seeking sanctions was prejudiced as a result of the destruction of evidence and whether any prejudice could be cured, (2) the practical importance of the evidence, (3) whether the spoliating party acted in bad faith, and (4) the potential for abuse if sanctions are not imposed." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020). Other factors to consider include fundamental fairness, alternative sources of the information obtainable from the evidence destroyed, and the possible effectiveness of other sanctions less severe than

dismissal." *Morrison v. Veale*, 3:14-CV-1020-TFM, 2017 WL 372980, at *3 (M.D. Ala. Jan. 25, 2017).

In order for a court to impose sanctions, bad faith on the part of the spoliating party is required. "'[A] party's failure to preserve evidence' rises to the level of sanctionable spoliation in this Circuit 'only where the absence of that evidence is predicated on bad faith,' such as where a party purposely 'tamper[s] with the evidence.'" *Wandner v. American Airlines*, 79 F. Supp. 3d 1285, 1297 (S.D. Fla. 2015) (quoting *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997)). "[B]ad faith in the context of spoliation, generally means destruction *for the purpose of hiding adverse evidence*," and "[t]his consideration is key in evaluating bad faith because the party's reason for destroying evidence is what justifies sanctions (or a lack thereof)." *Tesoriero*, 965 F.3d at 1184 (emphasis added). Bad faith can be found based on "direct evidence or circumstantial evidence where certain factors converge." *Bell Aerospace Servs., Inc. v. U.S. Aero Servs., Inc.*, No. 1:09-CV-141-MHT, 2010 WL 11425322, at *2 (M.D. Ala. Feb. 18, 2010).

When "*no direct evidence of bad intent exists* . . . bad faith may be found on circumstantial evidence where all of the following hallmarks are present: (1) evidence once existed that could have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator." *Bell Aero. Servs., Inc.,* 2010

WL 11425322, at *2 (emphasis added) (quoting *Calixto v. Watson Bowman Acme Corp.*, 2009 WL 3823390, *16 (S.D. Fla. 2009)).

It is not necessary to show the spoliator acted with malice under the bad faith/culpability factor in the Eleventh Circuit. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 946 (11th Cir. 2005); *Oil Equip. Co. Inc. v. Modern Welding Co. Inc.*, 661 F. App'x 646, 658 (11th Cir. 2016) ("'[M]alice,' which, while clearly sufficient, is not necessary to support a finding of bad faith in this Circuit."); *Silver v. Countrywide Home Loans, Inc.*, 483 F. App'x 568, 572 (11th Cir. 2012). But there must be more than mere negligence. *E.g., Penick v. Harbor Freight Tools, USA, Inc.*, 481 F. Supp. 3d 1286, 1293 (S.D. Fla. 2020) (collecting cases); *Long v. Celebrity Cruises, Inc.*, 12-22807-CIV, 2013 WL 12092088, at *7–8 (S.D. Fla. July 31, 2013) (ordering spoliation sanctions based upon reckless conduct). Instead, "[b]ad faith can be found when a party fails to preserve evidence that it knew or should have known was relevant to litigation." *Long*, 2013 WL 12092088, at *7.

Sanctions the Court may impose against a party for spoliation include, but are not limited to, default judgment or dismissal, adverse inference or rebuttable presumption instructions to the jury, striking pleadings, and an award of fees and costs incurred by the injured party as a result of the spoliation. *Morrison v. Veale*, 3:14-CV-1020-TFM, 2017 WL 372980, at *5 (M.D. Ala. Jan. 25, 2017).

Here, there is no dispute that Cody's vitreous fluid samples were destroyed. And while AIG now attempts to lessen the significance of the samples' destruction by claiming that the samples were compromised, the vitreous fluid was crucial and important to both

the Waterses and AIG. Both parties acknowledge the reliability of vitreous fluid over cardiac blood for the purpose of determining BAC. Indeed, AIG retained legal counsel in Louisiana and initiated a legal proceeding to obtain the vitreous samples and have them tested. And further, it cannot be honestly disputed that the Waterses were prejudiced by the samples' destruction because had they been tested, the testing results could have rebutted AIG's determination that Cody's death was the result of intoxication—or confirmed it. This evidence was crucial to both parties, because even AIG acknowledges that it could have impacted the claim decision.

AIG's assertion that the vitreous samples would have had little probative value as to Cody's BAC lacks credibility, relies upon pure speculation, conflicts with the value that AIG itself placed upon the samples as evidenced by its own actions to obtain the samples, conflicts with its own internal communications about its importance, is self-serving, and would potentially reward the spoliator. *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1379 (S.D. Ga. 2008) ("To require a party to show, before obtaining sanctions, that unproduced evidence contains damaging information would simply turn 'spoliation law' on its head."); *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 133 (S.D. Fla. 1987) ("While it is now impossible to determine precisely what or how many documents were destroyed, the bad faith destruction of a relevant document, by itself, 'gives rise to a strong inference that production of that document would have been unfavorable to the party responsible for its destruction.'"); *Evans v. Mobile Cnty. Health Dept.*, 2012 WL 206141, at *12 (S.D. Ala. Jan. 24, 2012) (explaining that the "plaintiff's willful disregard of her obligation to preserve evidence has inhibited the production of evidence that may have been harmful to her case

such that whether the spoliated evidence would, in fact, have been detrimental is irrelevant since no one, other than perhaps [the plaintiff] herself, can know for certain."). Indeed, because of the samples' destruction, there is no way to cure it. On this point, AIG does not actually raise a challenge, instead focusing its argument on whether it acted in bad faith.

In the Court's view, whether AIG acted in bad faith is the pertinent issue that drives the outcome of whether there has been sanctionable spoliation here. The Waterses argue that AIG acted in bad faith. AIG concedes some degree of fault but couches its culpability as mere inadvertence or negligence.

The Waterses argue that undisputed evidence confirms: (1) AIG had a known duty to preserve evidence relating to existing litigation; (2) AIG and its Louisiana counsel became the custodians responsible[3] for the samples when they issued a subpoena to compel release of the samples from LSU; (3) AIG and its counsel were responsible for the instructions given to LSU and to AIG's vendor for shipping, preservation, and destruction; (4) AIG and its legal counsel failed to instruct the vendor to preserve the samples and in fact authorized their destruction by failing to check the appropriate boxes on the vendor instruction form; 5) AIG and its legal counsel ignored communications from the vendor about the pending destruction of the samples; and (6) AIG did not include the Waterses in any of these decisions.

In response, AIG primarily focuses on its intent and whether it engaged in an affirmative act causing the evidence to be lost. This factor does *not* require establishing

---

[3] This is confirmed by the testimony of Dr. Lindsay and NMS Labs and the sample submission form. (*See* Doc. 164-11 at 27, 36–37, 51, 54; Doc. 164-31 at 10.)

AIG's intent or motive when it performed the affirmative act. *See, e.g.*, *Bell Aerospace Servs., Inc.*, 2010 WL 11425322, at *2 (finding an affirmative act because "there is no question that Hall affirmatively caused the evidence to be lost when he *allowed* the 2002 laptop to be reformatted – which resulted in the complete loss of data on the computer") (emphasis added); *Jarvis v. TaylorChandler, LLC*, 480 F. Supp. 3d 1339, 1357 (M.D. Ala. Aug. 19, 2020) ("Second, Stuart admitted that she engaged in acts that caused the evidence to be lost.").

The Waterses contend that AIG committed a volitional act when AIG "specifically authorized" NMS Labs to discard the vitreous fluid samples as evidenced by the manner in which AIG, through its Louisiana attorney, completed the shipping and testing instructions for NMS Labs; that is, failing to check the box that would have required NMS Labs to preserve the samples. The Waterses also point to the instructions given by Dr. Lindsay to AIG as well as the numerous follow up communications by NMS Labs about its intention to destroy the samples unless directed otherwise.

AIG argues that it never affirmatively instructed NMS Labs to destroy the samples. Instead, it contends there was merely an inadvertent omission on its part in not instructing NMS Labs to preserve or return the samples, a sin that has not been sanctioned by other courts. *See Brooks v. Phoenix Metals Co.*, No. 1:15-CV-3612-ODE-JKL, 2017 WL 11093573, at *9 (N.D. Ga. May 22, 2017) (holding that "[t]he PeopleNet documents were deleted by a third-party vendor as a matter of routine maintenance" and did not prove that the nonmoving party acted "with intent to deprive or bad faith when it failed to preserve the PeopleNet documents"); *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F.

Supp. 2d 1317, 1332 (S.D. Fla. 2010) ("There is no evidence that the defendant intentionally deleted the emails and email attachments or intentionally failed to place the litigation hold until June 2009 to ensure that relevant emails and attachments would be deleted.").

AIG's position is very troubling, as it condones destruction by inaction.  What does appear to be undisputed is that AIG undertook multiple affirmative actions at considerable expense to obtain the fluid samples with the intention of testing them, but AIG took no actions whatsoever to preserve, protect, or have the samples returned despite multiple opportunities to do so. As the record shows, aside from its general duty to preserve evidence, AIG ignored the written instructions from NMS Labs when the samples were initially submitted for testing.  It then ignored two follow-up communications from NMS Labs that informed AIG of its intention to destroy the samples.  Again, AIG did not nothing to respond or to protect the samples. Indeed, AIG has not identified a single act it undertook to preserve the vitreous samples, and none of the "routine procedures" cases cited by AIG bear any resemblance to what AIG did here.[4]

At its best, AIG's conduct was reckless; at worst, it was intentional.  Failing to take any steps to preserve evidence is sufficient to find that more than "mere negligence" was involved. *See Flury*, 427 F.3d at 944-45; *Oil Equip.*, 661 F. App'x at 656 (affirming dispositive relief because the spoliator: (1) excluded the opposing party from its examination of the evidence, (2) failed to preserve the evidence or allow the opposing party

---

[4] The Waterses devote many pages of their brief arguing about a settlement agreement reached between counsel concerning the Louisiana litigation.  The Court sees little value in analyzing an issue that has little relevance as to whether spoliation has actually occurred.

to examine the evidence, and (3) the destruction of the evidence prevented the opponent from "gathering critical evidence relevant to its theory."); *Long*, 2013 WL 12092088, at *7 ("[T]here is circumstantial evidence of bad faith in this record because it is undisputed that Defendant knew of the video's relevance to potential litigation and understood the duty to preserve the video."). Accordingly, the Court concludes the Waterses have proven spoliation occurred here.

Because there is no jury in an ERISA action, the remedies for spoliation are somewhat narrowed here. Remedies include (1) a default judgment; (2) an irrebuttable or rebuttable presumption of some sort; and (3) striking of experts or some or all of their opinions. The Court finds that an appropriate sanction or remedy is a finding, in a light favorable to the Waterses, of a presumption of what the vitreous samples may have shown had they been tested. That is, that the testing of the vitreous samples would have revealed an alcohol content less than that indicated by the test results from the cardiac blood.

But even with this presumption in place, the Waterses have not presented any evidence, through expert opinion or otherwise, that *all* of the alcohol in Cody's system was attributable to postmortem issues. Instead, Dr. Valentine opines that *some* of the alcohol in Cody's system "could" have been caused by postmortem fermentation and that *some* could be attributable to postmortem redistribution. A presumption that the vitreous fluid would have shown *no* alcohol in Cody's blood is not supported by the record evidence or by any proffered scientific opinion and would be inappropriate here, even as a spoliation sanction.

Therefore, the question at issue is what level of alcohol existed in Cody's system at the time of the accident due to his own consumption of alcohol versus the amount that

could be attributed to postmortem issues. The Court will expound on this later in its analysis of the administrative record.

## C. The Court's Scope of Review

The first step of this Court's ERISA analysis is *de novo* review, which is a review without deference to AIG's decision. *Firestone Tire & Rubber Co., v. Bruch,* 489 U.S. 101, 115 (1989); *Williams v. BellSouth Telecomm., Inc.*, 373 F.3d 1132 (11th Cir. 2004), *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008); *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350 (11th Cir. 2011). The claim is then decided in the same way as an ordinary civil contract claim. *Bruch,* 489 U.S. at 112–13.

There is some disagreement between the parties as to the evidentiary scope of the Court's review. AIG argues for review based strictly on the record that was before the claims administrator, and the Waterses argue for consideration of all the evidence, including the post-claim appeal and post-lawsuit depositions. *Shaw v. Con. Gen. Life Ins. Co.*, 353 F.3d 1276, 1284 n.6 (11th Cir. 2003) ("As a rule, de novo review permits the parties to put before the district court evidence beyond that which was presented to the administrator at the time the denial decision was made"); *Kirwan v. Marriott Corp.*, 10 F.3d 784, 789 (11th Cir. 1994) ("In this circuit, a district court conducting a *de novo* review of an Administrator's benefits determination is not limited to the facts available to the Administrator at the time of the determination."); *Moon v. Am. Home Assur. Co.*, 888 F.2d 86, 89 (11th Cir. 1989) ("American Home's contention that a court conducting a de novo

review must examine only such facts as were available to the plan administrator at the time of the benefits denial is contrary to the concept of a de novo review.").

While the Court does not necessarily agree that the scope of its *de novo* review is as broad as the Waterses claim, it is likewise not as narrow as AIG suggests. Instead, the Court will undertake its review in consideration of both parties' respective positions; that is, *de novo* wrong review based strictly on the administrative record at the time of the initial claims decision, then again at the time of the claim appeal decision, and then again based upon the entirety of the evidentiary record presented to this Court.

### D. The Policy's Intoxication Exclusion

Under the AIG policy, benefits are payable when the death is the result of an accident, and the particular cause of the accident is not excluded under the policy's exclusion provisions. Here, AIG did not dispute that Cody's death was the result of an accident. Instead, AIG concluded that the loss was excluded from coverage under the policy's intoxication exclusion, which reads, "[t]he Policy does not cover any loss caused in whole or in part by, or resulting in whole or in part from, . . . the Insured Person being under the influence of drugs or intoxicants, unless taken under the advice of a Physician." (Doc. 173-2 at 49.)

The exclusion does not provide for a specific BAC or that Cody be deemed intoxicated under any particular state law that sets forth presumed levels of intoxication. *See Whiteside v. Securian Life Ins. Co.*, No. 8:17-CV-853-T-30AAS, 2017 WL 8897132, at *7 (M.D. Fla. Dec. 7, 2017) (distinguishing between exclusions referencing state-law presumptions and a "broader" one requiring only a loss resulting in part from "the use of

alcohol"). The exclusion language only requires that the insured's accident result in whole *or in part* from the insured being "under the influence" of alcohol.[5]

Therefore, here, the record must establish that it is more likely than not that Cody's death was, at least in part, caused by or resulted from Cody being under the influence of any degree of an intoxicant, such as alcohol. *See Horton v. Reliance Standard Life Ins. Co*., 141 F.3d 1038, 1040 (11th Cir. 1998) ("[I]f the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage"); *see also Raymond v. Life Ins. Co. of N. Am.*, 924 F. Supp. 2d 1345, 1351 (S.D. Fla. 2010) (holding that, because Ambien had been prescribed and was at least "in part" the cause of the fatal polydrug toxicity, the medical treatment exclusion excluded coverage).

## E. The Claim Decision Based on the Administrative Record

As shown by the administrative record, AIG primarily relied on evidence from the State of Louisiana's investigation into the cause of the crash and the Shreveport Police Department's resulting Uniform Motor Vehicle Traffic Crash Report. That report, and the accompanying file, included a statement from the sole eyewitness that Cody's truck, for no readily apparent reason such as avoiding an animal or another vehicle, veered to the side, swerved back and forth, and flipped over before coming to a rest. Cody, who was not seat-belted, was ejected from the truck.

---

[5] Although state law is not relevant to the interpretation of the policy, the Court notes that Louisiana law defines "operating a vehicle while intoxicated" both as having a BAC at or above 0.08 or as being "under the influence of alcoholic beverages." La. Stat. § 14:98. The latter definition would, by necessity, include being "under the influence" at a BAC lower than 0.08.

The file also included the medical examiner's autopsy report which noted, based on the official toxicology results indicating a 0.113 BAC, that there was a "[h]igh level of ethanol" in the postmortem blood, as well as the Louisiana Certification of Death which also listed "ethanol use" as the only "significant conditio[n] contributing to death." Therefore, based on these records, the Shreveport Police Department's traffic crash reconstructionist/crash investigator concluded that the "causal factor of the crash [was] determined to be careless operation of the motor vehicle due to ethanol intoxication (alcohol impairment)." (Doc. 173-6 at 39.)

All of these records—which importantly came from neutral, disinterested parties— constitute the official statement from Louisiana authorities as to the cause of the accident and Cody's death. And none of these documents have been amended, supplemented, or officially challenged by the Waterses with the Louisiana authorities to reflect anything other than that alcohol was involved in the accident.

Courts routinely hold that a claims administrator is not *de novo* wrong to rely on a death certificate and autopsy report in evaluating claims for death benefits. *See, e.g.*, *Lann v. Metro. Life Ins. Co.*, 371 F. Supp. 3d 1185, 1192 (N.D. Ga. 2019) (concluding that claims administrator was not *de novo* wrong in doing so). Moreover, these official documents are "particularly persuasive" because they are "prepared by independent government employees pursuant to statutory duties, with no interest in the outcome of a subsequent claim for insurance benefits." *Id.* at 1193 (citing *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1156 (10th Cir. 2009); *Sorrells v. Sun Life Assur. Co. of Can.*, 85 F. Supp. 2d 1221, 1233 n.20 (S.D. Ala. 2000)); *see also Zieglar v. Reliance Standard Life Ins. Co.*, No.

606CV1176ORL28UAM, 2007 WL 9701531, at *6 (M.D. Fla. Oct. 29, 2007) (finding that a claims administrator was not *de novo* wrong to rely on the "reasonable conclusion by an unbiased crash investigator conducting a traffic homicide investigation for the purposes of the Florida highway Patrol—not for [claims administrator] or for Plaintiff.").

The third-party *official* investigation in this case eventually resulted in the conclusion that alcohol was involved in Cody's accident. The medical examiner included the toxicology report as part of his autopsy without comment or criticism.  And the accident investigator, with the additional benefit of his own accident scene observations and the statement of the eyewitness, concluded that alcohol was involved as a contributing factor in Cody's death. These unbiased third-party conclusions are satisfactory evidence of Cody's intoxication and its contribution to the accident and Cody's death, and for this reason, the Court concludes that the claims administrator's decision to deny the claim based on the intoxication exclusion was not *de novo* wrong.

The Court further concludes that the arguments raised by the Waterses to attack the cardiac blood BAC results do not change the outcome. The Waterses argue that these neutral-party conclusions are all tainted by the cardiac blood test results, which are unreliable because of alleged issues associated with postmortem fermentation and redistribution/diffusion. The problem with these arguments is that they generally are not supported by concrete objective evidence that any fermentation or redistribution actually occurred, let alone occurred with a sufficient degree to altogether explain away all or a substantial amount of the alcohol in Cody's system.

Indeed, the various theories submitted by the Waterses each suffer from one sort of malady or another. For example, the Waterses point to Dr. Valentine's assertion that Cody's body went unrefrigerated for an extended period of time, and therefore the alcohol in the cardiac blood specimen "could, in part, be attributed" to postmortem formation of alcohol. But Dr. Valentine did not point to any evidence that the body was unrefrigerated or otherwise handled in such a manner that would have produced sufficient postmortem alcohol to render the blood sample materially unreliable for purposes of a BAC determination. Instead, he opines that the alcohol "could" be "at least in part" considered postmortem alcohol fermentation, but never quantifies what that amount may be.

And further, his opinion appears to be premised upon unsupported speculation about the handling of the body in the hours after the accident, and one that conflicts with the actual evidence in the record. The administrative record reveals that the coroner's office arrived at the scene of the crash not long after the accident, took possession of Cody's body, and that his body was "cold to the touch" when the blood samples were taken during the autopsy several hours later. Based on this evidence, it would therefore be unreasonable for the Court to altogether ignore the results of the cardiac blood test and the conclusions of the state investigators. *See Zieglar*, 2007 WL 9701531, at *5 (rejecting as conjecture the plaintiff's retained toxicologist's similar opinions about the body being left unrefrigerated and "'significant bacterial and fungal growth' that 'could' have resulted" and concluding that the claims administrator was not *de novo* wrong to reject them); *Sorrells*, 85 F. Supp. 2d at 1233 n.20 (rejecting chain-of-custody argument where no evidence supported that official test results were compromised).

37

Further, the Waterses' reliance on the general premise that vitreous fluid is a better indicator of BAC at the time of the accident does not change the analysis. Indeed, Dr. Valentine does not provide any persuasive or concrete authority stating that measuring BAC from cardiac blood is strictly prohibited, generally unreliable in and of itself, or should not be given any degree of persuasiveness. At best, his opinions attribute potentially *some* of the alcohol content to postmortem events. And most tellingly, nowhere does he attribute all of the observed ethanol to events separate and apart from Cody's consumption of alcohol.

But even assuming Dr. Valentine's theories were true, it does not eliminate the likelihood that Cody consumed alcohol and that it was in his system at the time of accident, or the reasonable conclusion that Cody's alcohol consumption contributed to his accident and death. *See, e.g.*, *Whiteside*, No. 8:17-CV-853-T-30AAS, 2017 WL 8897132, at *7 (finding that an expert's conclusion that the toxicology report's 0.234 BAC was wrong, and that decedent's BAC was "only between 0.015 g% and 0.079 g%" did not negate the reasonable conclusion that alcohol contributed to the decedent's death).

The Waterses' attack on the question of causation suffers from similar deficiencies. Putting aside the independent findings of the accident reconstructionist and medical examiner, the administrative records contain the observations of Dr. Lage, who was retained to perform a review of the alcohol evidence. He explained that, with a BAC of even .08, Cody would have been experiencing diminished judgment, dulling of attention, sedation, impaired coordination and possibly disorientation, impaired balance, and slurred

speech. He also opined that Cody still would have experienced dulling of attention, sedation, and impaired coordination down even to a BAC of 0.05.

These physiological effects are consistent with the events of the crash as explained by the sole eyewitness—who is, again, a disinterested, neutral witness—that is, Cody was driving his truck without a seatbelt late at night, veered left and right, lost control, and flipped, all of which are consistent with a diminished capacity due to alcohol consumption. *See Prelutsky*, 692 F. App'x at 974 (upholding the reasonableness of similar conclusions about the causal relation between intoxication and a decedent's death, even though no one had witnessed his fall down the stairs, concluding that his intoxication "could have prevented him from catching himself, or covering his head, or mitigating the impact of his fall in some other way.").

The Waterses try to poke holes in the investigating officer's causation conclusions by arguing that there were other "plausible scenarios" that could explain the accident, such as falling asleep at the wheel and then reacting upon awakening to another car entering the roadway. But the officer who investigated the accident explored the scenario that Cody may have been attempting to avoid another vehicle. He examined the truck and questioned the eyewitness about a possible collision or impact. Following his investigation, the officer made no finding that another vehicle caused the accident. Regardless, even the involvement of a second vehicle would not rule out alcohol as a contributing factor in the accident.

Based on the Court's review of the administrative record, the Court concludes that AIG's claim decision was not wrong. To the contrary, the State of Louisiana's official file based on its officials' own independent investigations identified alcohol as a causal factor

to the accident and Cody's ultimate death. Dr. Valentine's report and supporting documents do not undermine this conclusion, at least not to a degree sufficient to discredit the reasonable conclusions of Louisiana officials. While Dr. Valentine attempts to place doubt on the source of some of the observed alcohol in Cody's system, he does not explain away all of it. Based on the totality of the facts in the record, and in light of the exclusion language in the policy, the Court concludes that AIG's claim decision was entirely reasonable and consistent with the evidence and the policy.

## F.  Additional Evidence from the Full Administrative Record

Consideration of the additional evidence between the filing of this action and the final appeal decision does not change the Court's determination that AIG's claim decision was reasonable and not wrong. Instead, the additional evidence only strengthens this conclusion.

The additional evidence that falls into this scope of review primarily includes the final report from Dr. Lindsay, who was retained to address and respond to Dr. Valentine's report. In her report, Dr. Lindsay concluded that Cody's manner of driving is consistent with alcohol intoxication and that there is no factual support for Dr. Valentine's conclusions about postmortem synthetization of or redistribution/diffusion of ethanol in Cody's body.

The Waterses attempt to lessen if not negate the impact of Dr. Lindsay's report by characterizing some of Dr. Lindsay's opinions as based on hearsay; for example, whether the body was refrigerated and when. But under an ERISA administrative record review, the Federal Rules of Evidence do not apply. And further, from a factual basis standpoint,

even the medical examiner's own log of events does not support Dr. Valentine's theory. As Dr. Lindsay stated, refrigeration of the body and the short interval between death and autopsy "would have prevented any significant bacterial action." (Doc. 62-2 at 4.)

Dr. Lindsay also points to other evidence that the cardiac blood sample did not undergo postmortem alcohol fermentation because, for example, the sample did not contain other "volatiles" which would typically exist if there had been fermentation. The Waterses contend that this does not "prove" that the cardiac blood was reliable because studies have shown that other volatiles are more common and that not all volatiles are present in every case of fermentation. (Doc. 188 at 34.)  But the fact that this evidence may not definitively prove the proposition does not render it non-evidence.  In fact, Dr. Valentine's own article confirms that the presence of other volatiles is indicative of postmortem formation of alcohol and that the lack of those volatiles would constitute evidence that no postmortem alcohol formation had occurred.[6]

Dr. Lindsay also provided further response to Dr. Valentine's equivocal opinions about redistribution/diffusion. While Dr. Valentine would only say that redistribution would have contributed some unknown amount of alcohol to the observed BAC, Dr. Lindsay explained, with supporting articles, that "[e]thanol does not exhibit significant post-mortem redistribution to the extent that it would have altered the cardiac to peripheral (C:P) blood alcohol ratio *by any significant degree*." (Doc. 173-19 at 234.)

---

[6] In a section entitled, "Criteria for Recognizing Post-Mortem Ethanol Production," Dr. Valentine states that "[t]he two criteria for identifying post-mortem ethanol production are an abnormal distribution of ethanol among body tissues and the presence of low molecular weight volatile compounds by gas chromatography during the analysis of ethanol." (Doc. 173-15 at 4.)

The Waterses also challenge Dr. Lindsay's opinions as they concern the connection between BAC and Cody's accident. In her report, Dr. Lindsay provided additional information about the negative effects alcohol has on driving performance, noting that a BAC of 0.10 lengthens reaction time "by 80 percent" and "severely impair[s]" coordination and perception. (Doc. 173-19 at 234.)    She also noted that even at BAC's below 0.08 "[v]isual tracking, peripheral vision and glare recovery is also severely impaired."  (*Id.*) Consistent with Dr. Lage's report stating that drivers with BAC's as low as 0.02 and 0.04 are at risk of fatal car crashes at a 1.4 times higher rate than normal drivers (Doc. 173-3 at 3), Dr. Lindsay stated that alcohol consistently impacts driving performance at 0.04 BAC and as low as 0.02, (Doc. 173-19 at 234).  She further stated that "[i]ncreased risk taking sets in at BAC's below 0.05 g/dl" and "[c]omplex reaction time, coordination, decision making, balance and vision are all impaired below 0.05 BAC" with "[t]he majority of the studies showed impairment at less than 0.07 BAC." (*Id.*)  This provides further support for the conclusion that, even if an insignificant portion of Cody's 0.113 BAC was due to fermentation or redistribution, Cody being "under the influence" of even a small amount alcohol likely contributed to the accident.

Based on the full administrative record at the time of the final decision, the Court agrees with AIG that Cody being "under the influence" of alcohol contributed, at least in part, to his fatal crash.

### G. Consideration of Evidence Outside the Administrative Record

The evidence outside the administrative record only further supports the conclusion that AIG's denial was not *de novo* wrong. This evidence consists largely of deposition

testimony from each of the experts who provided reports, expert testimony from yet another expert, Dr. Johnson, a rebuttal report from Dr. Valentine, and records received in response to subpoenas, including records from LSU.

LSU's records confirm that, before his autopsy, Cody's body was refrigerated in "Cooler #28" after 1:46 a.m. the night of the crash—roughly two hours after the accident. Further, Dr. Johnson's expert report confirmed the opinions of Dr. Lindsay and Dr. Lage that the time between death and autopsy would not have been long enough to raise concerns about postmortem alcohol formation.  Although Dr. Valentine's rebuttal report asserted that the time between death and autopsy would not have been "too short for *any* microorganism growth and production of neo-alcohol," Dr. Valentine never stated that the time frame generally was enough to produce a *materially significant* amount of alcohol.[7] (Doc. 173-22 at 3.)  Indeed, not once does Dr. Valentine opine that all of the BAC can be attributed to fermentation, or any sources other than Cody's own consumption of alcohol. At best, Dr. Valentine provides opinions for lessening the BAC observed in the cardiac blood; he does not altogether eliminate it.

Dr. Johnson also confirmed the prior statements about the effects of alcohol and their consistency with the reports of the crash. In the end, Dr. Johnson stated that, "[a]lthough due to the potential for postmortem redistribution we will never know the

---

[7] As additional evidence that Dr. Valentine's opinions lack credibility, AIG produced Dr. Valentine's testimony from another case in Mississippi where he testified that postmortem fermentation is a "slow process" that would take "between one to two days" at room temperature before "you could start seeing the alcohol produced." (Doc. 185-2 at 24–25.) The Court agrees that Dr. Valentine's opinions are vague, general, lack specificity, and contradict both the record facts and his own prior testimony.

precise BAC of [Decedent] at the time of the crash, we do know to a scientific certainty that consumption of alcohol occurred prior to the crash, and the circumstances surrounding the crash are consistent with the intoxicating effects of that alcohol." (Doc. 173-21 at 7.) He also echoed Dr. Lage and Dr. Lindsay's statement about the effects of alcohol on driving performance, noting symptoms including lack of vigilance, inability to maintain a lane of travel, inability to properly react to emergency situations, and impaired decision-making and referred to studies showing that a BAC of even 0.02 can "slow reaction times and make it difficult to react in emergency situations." (Doc. 173-21 at 4–5.)

Outside the administrative record, the Waterses have identified a host of other possible explanations for the cause of Cody's accident. But none of them appear factually supported.  For example, the Waterses suggest that high winds could account for Cody's erratic driving behavior. But AIG presented evidence that there were no high winds that evening.

Citing to a New York Times article, the Waterses also argue that trucks are more likely to roll over than other vehicles and that single-vehicle rollovers more often than not have nothing to do with alcohol consumption.  But even that theory defies plausibility because it does not, for example, explain the left and right swerving of Cody's vehicle (that is, the loss of control) before it spun around and flipped over. And further, the cited article acknowledges that Cody's truck was no more likely to roll over than any other vehicle. *Rollover Ratings for Vehicles Is Released*, THE NEW YORK TIMES (July 15, 2003) (available at https://www.nytimes.com/2003/07/15/us/rollover-rating-for-vehicles-is-released.html).

Similarly, the Waterses' citation to an April 2002 National Highway Traffic Safety Administration report about the lack of connection between rollover crashes and alcohol consumption is unavailing. Indeed, a plain reading of the NHTSA report actually shows the opposite.[8] As the report notes, the majority of single-vehicle fatal rollovers are related to alcohol ingestion (53%). And that percentage increases to 61% when it is limited to pickup trucks like the one Cody was driving. (Doc. 188 at 20 n.19.) ("Involved drivers in single vehicle fatal rollovers were even more likely to have tested positive for blood alcohol. With the exception of SUV and van drivers, the proportion of drivers with positive BAC was over 50 percent, led by the pickup truck drivers, 61 percent of whom had positive BAC test results.").

Based on consideration of all of the evidence, including evidence outside of the administrative record, the Court concludes that AIG's denial of the Waterses' claim for death benefits was not *de novo* wrong.

## H. Consideration of All Evidence with Spoliation Finding

Finally, the Court concludes that AIG's claim decision was not *de novo* wrong even if AIG had not allowed the vitreous fluid samples to be destroyed; that is, had the samples been tested and had they shown a BAC less than that indicated by the cardiac blood.

Of all the remedies available where spoliation has occurred, the one the Court finds warranted here is an adverse inference. Like a jury, the Court will undertake its review

---

[8] *See Characteristics of Fatal Rollover Crashes*, U.S. DEPT. OF TRANSP., NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, p. 37, DOT HS 809 438 (Apr. 2002), available at https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/809438.

under the premise that had the vitreous samples been tested, they would have revealed a BAC lower than .113; that is, a level lower than what the cardiac blood test revealed. But the Court elects not to infer that Cody's BAC would have been zero because even the Waterses' own expert, Dr. Valentine, does not state as much. Instead, giving his opinions the benefit of the doubt, the sum total of his testimony and the referenced peer review articles is that some degree of the ethanol content in Cody's system would be due to postmortem events. Importantly though, Dr. Valentine never says what that amount would have been, and nor do the peer review articles that he has presented. Drs. Lage, Lindsay, and Johnson, however, state that the impact would be minimal at best. And the experts' cited articles appear to attribute postmortem synthesis of a materially significant amount to factual scenarios very different from those presented here. Accordingly, the Court will infer, based on the totality of the record evidence, that some minimal amount of alcohol is attributable to postmortem factors.

The question then is whether this inference would make AIG's claim decision *de novo* wrong. The Court concludes that it does not. First, the insurance policy does not condition application of the intoxication exclusion on a particular BAC level.  Instead, the policy conditions its application on whether Cody being under the influence of an intoxicant, regardless of his BAC level, contributes to the accident even in part.

Here, the record reflects that a single-vehicle accident occurred late at night, without any extraneous cause, by a person who had consumed some amount of alcohol in the hours before the accident. The Court cannot say that a BAC at some level below 0.113, with all else being same, would render moot or less reliable the opinions of the Louisiana officials

46

who investigated the accident and examined Cody's body. Nor would it render application of the policy exclusion wrong. Because again, the policy language requires only that the insured's consumption of alcohol contribute only in part to the accident. The evidence in the record indicates that Cody did consume alcohol and that it played at least some role in his accident. AIG's claim decision was not *de novo* wrong under these facts. The Court, therefore, ends it inquiry and affirms AIG's claim decision.

## IV.   <u>CONCLUSION</u>

Upon review of the record, the Court concludes that AIG's decision was not *de novo* wrong.  Accordingly, it is ORDERED as follows:

1.     The Plaintiffs' Motion for Relief Concerning Destruction of Evidence (Doc. 163) is GRANTED in part. It is granted to the extent that the Court concludes the Defendants have spoliated evidence and are entitled to relief in the form of an adverse inference as to what the vitreous fluid would have shown had it been tested. All other requested relief is DENIED.

2.     The Plaintiffs' Motion to Exclude Testimony of Robert D. Johnson, Ph.D. (Doc. 169) is DENIED.

3.     The Plaintiffs' Motion to Exclude Testimony of Janci Lindsay (Doc. 170) is DENIED.

4.     The Plaintiffs' Motion for Summary Judgment (Doc. 171) is DENIED.

5.     The Defendants' Motion for Judgment as a Matter of Law (Doc. 172) is GRANTED.

6.      The Defendants' Motion to Exclude or Limit Testimony of Plaintiffs' Expert

Jimmie Valentine (Doc. 174) is DENIED.

7.      The parties shall bear their own costs.

DONE, on this the 22nd day of June, 2022.


_____/s/ R. Austin Huffaker, Jr._____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE